979 So.2d 308 (2008)
B.M., a juvenile, Petitioner,
v.
Dale DOBULER, Super. Miami-Dade, etc., et al., Respondents.
No. 3D07-2734.
District Court of Appeal of Florida, Third District.
March 19, 2008.
*310 Bennett H. Brummer, Public Defender, and Billie Jan Goldstein, Assistant Public Defender, for petitioner.
Bill McCollum, Attorney General, and Lane Hodes, Assistant Attorney General, for respondents.
Before GREEN, SHEPHERD and ROTHENBERG, JJ.
PER CURIAM.
B.M., a child, petitioned this Court for a writ of habeas corpus on the ground that she was being held illegally in secure detention pending disposition of a violation by her of the conditions of her probation. Although her petition, along with several others involving the same issue recently filed with this Court, has become moot, we address the issue because of its frequent continued recurrence before this Court. A.K. v. Dobuler, 951 So.2d 989, 990 (Fla. 3d DCA 2007) (noting that although time sensitivity required an earlier grant of habeas corpus, a later opinion was necessary to "give some guidance to the juvenile bench and bar"); R.G. v. State, 817 So.2d 1019, 1020 (Fla. 3d DCA 2002) ("We would think that the message to this trial court judge should be clear that he too must follow the law.").
The detention of juveniles in Florida is governed by chapter 985, Florida Statutes. See ch. 985, pt. V, Fla. Stat. (2007). Part III of chapter 985 expressly states that the sole means by which a juvenile judge may take a child into custody is "[p]ursuant to an order of the circuit court issued under this chapter." § 985.101, Fla. Stat. (2007); see also A.K., 951 So.2d at 991 ("In Florida, the detention of juveniles is governed completely by statute."); accord R.G., 817 So.2d at 1020. Section 985.24 of the Florida Statutes, entitled "Use of detention; prohibitions," clearly and unambiguously sets forth the grounds on which a child may be detained. See § 985.24(1)(a)-(e), Fla. Stat. (2007). Absent a statutory exception, see § 985.255(2), Fla. Stat. (2007), an order placing a child in detention must be based "primarily" upon at least one of those grounds and supported by a proper "risk assessment of the child." § 985.245(1), Fla. Stat. (2007); R.W. v. Soud, 639 So.2d 25, 26-27 (Fla.1994) ("[A]bsent the findings required by subsection (1) [of section 985.24] and the risk assessment required by [section 985.245(1)], detention of a juvenile is not permitted either before or after adjudication.").[1]
The only other authority to be found in chapter 985 authorizing a juvenile court judge to hold a child in custody or "secure detention" prior to adjudication or disposition appears in section 985.037 of the Florida Statutes, where the legislature afforded the juvenile court "limit[ed]" powers to "punish [a] child for contempt for interfering with the court or with court administration, or for violating any provision *311 of this chapter or order of the court relative thereto." § 985.037(1), Fla. Stat. (2007) (emphasis added); see also R.G., 817 So.2d at 1019 (holding that "[s]ection 985.213(2)(a) [now renumbered as section 985.245(1)] is clear in its requirement that all determinations and court orders regarding detention be based on a risk assessment of the child[,]" but noting that the trial court also may base an order of detention on the contempt statute).
This case involves an unmanageable fourteen-year-old child. In August 2006, the child, B.M., was charged with misdemeanor battery for kicking her mother in the leg during an argument. At the end of September, she accepted a plea in which she agreed to attend a state-sponsored Juvenile Alternative Sanctions System (JASS) diversion program in lieu of trial. When, on November 6, 2006, the court was advised that B.M. had failed to complete the program, it set her case for disposition on January 22, 2007. In the next thirty days, three "pick-up orders" were issued for B.M. for various infractions, resulting in the disposition hearing being rescheduled for December 19, 2006. B.M. voluntarily appeared in court on that date and pled guilty to the misdemeanor charge. The trial court sentenced her to probation, the conditions of which included that she "stay at her mother's home" and "abide by all the other rules and regulations [of] her probation officer and her mother."
Not surprisingly, B.M. had no interest in staying home. Between January and July of 2007, the juvenile court issued four more "pick-up orders" at the behest of her parents or her juvenile probation officer. Just as before, B.M. refused to report to home or school. During this time, she also was tested once for drugs, and the report came back negative. Eventually, B.M.'s irresponsibility drew an affidavit of violation of probation from her juvenile probation officer. In July, B.M.again appearing voluntarily before the courtpled guilty, and was sentenced to attend Dade Marine Institute, a nonresidential commitment program, abide a 7:00 p.m. curfew at her mother's house, attend counseling, and comply with other conditions. Thirteen days later, B.M. left home again, and between her disposition in July and the month of September, she drew another two "pick-up orders" and a second affidavit of violation of probation.
A hearing on this violation was set for October 22, 2007. B.M. again appeared voluntarily and again admitted to violating her probation. Disposition was set for November 9, 2007. As the hearing concluded, the judge summarily ordered her from the courtroom to secure detention pending disposition. When her counsel objected, the court responded that it would issue an order to show cause why B.M. should not be held in contempt of court for her unruly behavior. Two days later, the rule issued. But before a hearing was held on the show cause order, the court issued an Order of Detention. After chronicling B.M.'s conduct, the court stated:
This unfortunate history of this child running away, staying away from home for days at a time with people the Mother is unaware of is dangerous and risky behavior. The child has shown a willful, wanton disregard for all prior orders of the Court notwithstanding the Court, and DJJ's efforts to modify the Respondent's behavior. Both the Court and the Mother are afraid that this child will continue to run and eventually disappear and not return home, thereby subjecting her to the possibility of being killed or injured while she is out on the street. Further, there is a great possibility that the child will commit new law violations in order to support herself on the street or at the request of others who may be *312 supporting her. This is an untenable and unacceptable risk both to the child and to the community.
Based on this child's extensive record of absconding from home and her [u]tter disregard of the Court process, the Court has determined that it is in the best interest of the child to be detained until the date of her next hearing, which is the disposition on her second admission to a violation of probation scheduled for November 9th at 9:00 a.m.
There is no evidence that the court was favored with a statutory risk assessment instrument sufficient to justify upgrading B.M.'s status to secure detention before its summary dispatch of B.M. to a secure facility. The only risk assessment instrument provided to usprepared December 8, 2006 in connection with a "pick-up order"gives B.M. a score of one point for the shin kick she gave her mother.[2] A period of eighteen days would have passed between B.M.'s initial placement in secure detention on October 22, 2007, and her disposition on November 9, 2007.
On October 26, 2007, B.M. filed an emergency petition for writ of habeas corpus seeking release. On October 31, 2007, we granted the writ and ordered her immediate release from secure detention.

DISCUSSION
Florida's juvenile justice system isfor better or worsea creature of statute. See §§ 985.01-.807, Fla. Stat. (2007). This arrangement imposes a unique set of limitations on the ability of the circuit judges in this state to control juvenile delinquents. While the circuit judges of this state have a panoply of inherent powers to impose restraints on recalcitrant adult criminal defendants, the power of those same judges to detain a child respondent in a juvenile proceeding conducted pursuant to chapter 985 of the Florida Statutes is strictly limited by law. R.G., 817 So.2d at 1020; see also § 985.02(4)(a), Fla. Stat. (2007) ("The Legislature finds that detention should be used only when less restrictive interim placement alternatives prior to adjudication and disposition are not appropriate.").
In this case, B.M. argued to us that, under the circumstances, a juvenile court judge only had the power to detain her pursuant to a properly conducted contempt proceeding initiated pursuant to section 985.037(4)(b), Florida Statutes (2007). In that section, the legislature established the following procedure for juvenile contempt proceedings:

*313 (b) If a child is charged with indirect contempt of court, the court must hold a hearing within 24 hours to determine whether the child committed indirect contempt of a valid court order. At the hearing, the following due process rights must be provided the child:
1. Right to a copy of the order to show cause alleging facts supporting the contempt charge.
2. Right to an explanation of the nature and the consequences of the proceedings.
3. Right to legal counsel and the right to have legal counsel appointed by the court if the juvenile is indigent under s. 985.033.
4. Right to confront witnesses.
5. Right to present witnesses.
6. Right to have a transcript or record of the proceeding.
7. Right to appeal to an appropriate court.
§ 985.037(4)(b), Fla. Stat. (2007). Although the judge issued an order to show cause in this case, a hearing was never held on the rule issued. No statutory safeguards were afforded.[3]
In its response, the State conceded that the summary detention of B.M. could not be sustained under the juvenile court's statutory contempt powers, but argued that the trial court's dual findings that B.M. presented an "extensive record of absconding from home" as well as "disregard of the Court process" were sufficient to justify secure detention under section 985.255(3)(b) of the Florida Statutes (2007). For the reasons that follow, this argument is meritless, if not frivolous.
Ordinarily, the placement of a child into detention is dependent upon the existence of a validly prepared and scored risk assessment instrument supporting the placement. See supra n. 2. However, section 985.255(3)(b) of the Florida Statutes (2007), in which the State seeks solace in this case, authorizes a juvenile court judge to depart from the placement indicated in the risk assessment instrument and order a more restrictive placement in a proper circumstance. The section states: "If the court orders a placement more restrictive than indicated by the results of the risk assessment instrument, the court shall state, in writing, clear and convincing reasons for such placement." § 985.255(3)(b), Fla. Stat. (2007) (emphasis added). Importantly, the authorization to depart contemplates that the beginning point of any departure will be a preexisting risk assessment. See K.E. v. Dep't of Juvenile Justice, 963 So.2d 864, 866 (Fla. 1st DCA 2007) ("The written statement of clear and convincing reasons for deviating from the level of restrictiveness indicated by the standardized scoring is not optional; it is required by the department in order to make a more restrictive placement lawful."); Fryer, 765 So.2d at 265 (noting that a judge is "given the power to order a more restrictive placement than recommended by the RAI, but if that judge does so it must be based on clear and convincing reasons gleaned from the record and evidence and consistent with the statutes").
In this case, there is no evidence that the court had a risk assessment instrument in front of it when it ordered B.M. from the courtroom. There is no indication in the record, the hearing transcript, or in the judge's order, that the court took account of any risk assessment when it *314 ordered B.M.'s detention. Thus, the order of detention cannot fairly be called a "departure" from anything. § 985.25, Fla. Stat. (2007); K.E., 963 So.2d at 866. The trial court simply summarily ordered B.M. into detention.
Moreover, to the extent the court sought in its post-hearing Order of Detention to label B.M. as an "absconder" to justify detaining her, this post-hoc justification is not supportable either factually or legally. The record reflects that B.M. left or "ran away" from home on three occasions after entering the system as a result of kicking her mother in August 2006, and nine more times in the full year 2007. In each case, she was picked up either by her mother or authorities and returned to her mother. On the one occasion in 2006 for which we have a sufficient record from which to glean, B.M. left home on December 6 and was found by her mother the next day. Of the six occasions in 2007 for which we have data, the record reflects that she was away from home overnight on four occasions, two nights on a fifth occasion, and four nights on a sixth. There is no suggestion in the record of extraordinarily lengthy absences or even an effort to avoid judicial process. That these facts are insufficient to warrant the designation of B.M. as an "absconder" in this case is supported by reference both to case law and the manual of the department responsible for managing wayward youth in this state, the Florida Department of Juvenile Justice.
As to the latter, we allude to this referencethe Florida Department of Juvenile Justice's Probation & Community Corrections Handbooklargely due to the absence of a statutory definition of the term "absconder" in the law of this state as it has been adopted to protect the public against juvenile crime and delinquency. See generally ch. 985, Fla. Stat. (2007). This handbook, which aspires to function as a comprehensive guide to all Department staff, agents, interns, and volunteers associated with the Department in the performance of their duties, contains the following definitionutilized by juvenile probation officers and other Departmental officials who receive children taken into custody by law enforcementfor classifying a child as an "absconder" when completing a risk assessment instrument for that child:
1. A youth is considered an absconder if he/she "goes in a clandestine manner out of the jurisdiction of the courts in order to avoid the legal process", or "to hide, conceal, or absent oneself clandestinely, with the intent to avoid the legal process".
a. The juvenile probation officer must have cause to believe that the youth is deliberately avoiding supervision or has removed himself/herself from the home or community to avoid supervision and the legal process. A youth reported by the parent(s)/guardian(s) to have run away, without the parent(s')/guardian(s') knowledge of their whereabouts, is considered to be an absconder.
b. There must be intent to avoid the legal process. Simple absence or not appearing for appointments does not constitute absconding, but may constitute a technical violation of the conditions of probation.
Department of Juvenile Justice, Probation & Community Corrections Handbook, 6-27-28 (2006) (emphasis added). The definition is clear in its requirement of two elements: first, there must be some kind of "going in a clandestine manner," "hiding," "concealing," or "absenting"; and second, there must be some "intent to avoid the legal process." Id. Subsection 1.b underscores the importance of the intent *315 requirement of subsection 1 and draws a sharp distinction between "absconders" and children who merely have violated the conditions of their probation by "simple absence" or "not appearing." B.M. is not an "absconder" under any departmental rules, policies, or definitions of the Florida Department of Juvenile Justice.[4]
Nor is B.M. an absconder under the reasoning of the most comprehensive case that we have been able to locate in which a court of this state has plumbed the legal contours of the term in the juvenile context, Z.B. v. Department of Juvenile Justice, 938 So.2d 584 (Fla. 1st DCA 2006). In Z.B., the First District Court of Appeal had before it a consolidated appeal involving two separately detained petitioners. Id. One, Z.B., was adjudged an absconder simply for violating curfew and twice staying out all night. The other, G.T., was adjudged an absconder for failing to complete community service, failing to write an essay, unsatisfactory attendance in a program and failure to appear at his violation of probation arraignment. Id. Both were ordered to secure detention. Id. at 585. Without the additional points on their respective risk assessment instruments for absconding, neither would have been eligible. Id.
On appeal, both Z.B. and G.T. asserted that their offenses failed to rise to the level of "absconding" within the meaning of chapter 985, Part V. Id. Agreeing with the petitioners, the First District Court of Appeal found support in several legal quarters, including chapter 985 itself, the Department of Juvenile Justice Handbook, and the legal dictionary, noting that:
[I]t appears that although petitioners may have violated the curfew condition of their probation, petitioners cannot be considered "absconders" because they voluntarily returned to their approved residences. Petitioners do not meet [the Department's] Handbook's definition of an absconder. There was no evidence presented that either petitioner was "gone in a clandestine manner out of the jurisdiction of the courts in order to avoid legal process" or to "hide, conceal or absent himself clandestinely with the intent to avoid legal processes." Chapter 985 does not define the term "abscond," nor does there appear to be any juvenile case law defining the term. Black's Law Dictionary 7 (8th ed. 2004) defines abscond as to "depart secretly or suddenly, especially to avoid arrest, prosecution, or service of process," or "to leave a place, usually hurriedly, with another's money or property." The Interstate Compact on Juveniles, codified in Chapter 985, Part V, makes several references to juveniles who have "absconded, *316 escaped or run away,"[[5]] which suggests a leaving without the intent to return.
Z.B., 938 So.2d at 585-86.
Finally, according to the work of the First District, which our research confirms, "cases [exist] in which juveniles have been charged with both violating curfew and absconding, which suggests that curfew violations and absconding are not the same offense." Id. (emphasis added); see, e.g., K.G. v. State, 759 So.2d 752 (Fla. 4th DCA 2000) (reversing trial court finding of violation of aftercare where affidavit alleged that juvenile had violated by leaving home without permission, disobeying curfew and absconding from aftercare program); Dep't of Health & Rehab. Servs. ex rel. M.H. v. State, 447 So.2d 359, 360 (Fla. 1st DCA 1984) (finding a violation of community control where juvenile failed to abide by curfew and absconded). Z.B. fully supports our conclusion in this case that B.M. is not an absconder for purposes of a detention determination made pursuant to chapter 985. At most, B.M.like Z.B. and not unlike G.T.violated curfew, or, as the trial court itself at one point observed, on occasion chose simply to "stay[ ] away from home for [several] days at time."[6]
The State calls our attention to T.C. v. Layne, 725 So.2d 1278 (Fla. 4th DCA 1999), and argues that it is more apposite on the facts of our case than Z.B. We disagree. In T.C., the Fourth District Court of Appeal affirmed a decision of the juvenile court, which ordered T.C. to secure detention "for the dual reasons that she had escaped or absconded from a community control program and because she qualified for detention under the Department of Juvenile Justice's risk assessment calculation for the same reason." Id. at 1279. However, the issue addressed in T.C. was not whether she was an "absconder" but rather whether, under the law applicable at the time, "[T.C.'s] act of leaving her approved residence while on community control can be considered escaping or absconding from a `community control program.'"[7]Id. The court of appeal answered the question in the affirmative. Id. at 1280. Based on this finding, the State urges to us that the Fourth *317 District also implicitly found that she was an "absconder." Because the statute applicable at the time applies to both "an escapee or an absconder," see § 985.215(2)(a), Fla. Stat. (1997), no such deduction can be made. Of equal importance, the trial court had before it in T.C. "the Department of Juvenile Justice's risk assessment calculation"i.e., a risk assessment instrument. T.C., 725 So.2d at 1278. T.C. offers no support to the State in our case.
The second reason given by the trial court and argued to us by the State for ordering B.M. directly to secure detention"disregard of court process"is also an insufficient reason to support secure detention in this case. In the first place, it is not factually supported. B.M. has appeared voluntarily at every court hearing set in her case. Furthermore, if the trial court was truly of the belief that B.M.'s conduct amounted to an "[utter] disregard of court process," the proper vehicle by which to vindicate such a snub was a properly-convened indirect contempt proceeding. See § 985.037(4)(b), Fla. Stat. (2007); R.G., 817 So.2d at 1020; see, e.g., T.M. v. Dobuler, 959 So.2d 279, 280 (Fla. 3d DCA 2007) (noting that contempt is "an alternative permissible procedure to address juvenile violators of community control)" (quoting G.S. v. State, 709 So.2d 122, 123-24 (Fla. 5th DCA 1998)). The court ordered, but did not conduct, such a proceeding in this case. Instead, the court chose to accept a plea by B.M. for violation by her of her probation and set her case for disposition. Having so chosen, the court was limited to the remedies prescribed in section 985.439(4)(a)-(d), Florida Statutes (2007):
(4) If the child is found to have violated the conditions of probation or postcommitment probation, the court may:
(a) Place the child in a consequence unit in that judicial circuit, if available, for up to 5 days for a first violation and up to 15 days for a second or subsequent violation.
(b) Place the child on home detention with electronic monitoring. . . . if a residential consequence unit is not available.
(c) Modify or continue the child's probation program. . . .
(d) Revoke probation . . . and commit the child to the department.
See also Z.B., 938 So.2d at 586-87. Secure detention is not among these remedies.
While it is quite understandable that a juvenile court judge, as here, would be frustrated by B.M.'s lack of respect for the court and her motherherself a full participant in the effort to tame B.M.that does not empower the court to abandon its statutory role as a neutral arbiter between the child, the parents, and the power of the state. Even the United States Supreme Court has remarked about the negative impact on credibility and rehabilitative capacity that failure to follow the law can have in juvenile delinquency cases. See In re Gault, 387 U.S. 1, 26, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ("Unless appropriate due process of law is followed, even the juvenile who has violated the law may not feel that he is being fairly treated and therefore may resist the rehabilitative efforts of court personnel.") (quoting Stanton Wheeler & Leonard S. Cottrell, Jr., Juvenile DelinquencyIts Prevention and Control 33 (1966)). We will not pretend to expertise in this area. However, we do know that the courts charged with enforcing chapter 985 of the Florida Statutes relating to juveniles, including both the trial courts and all other courts in our state, are under a legislative charge "[t]o provide judicial and other procedures to assure due process through which children *318 and other interested parties are assured fair hearings by a respectful and respected court[.]" § 985.01, Fla. Stat. (2007). That is good enough for us.
In so stating, we are not unmindful of the concerns stated by the trial court for summarily ordering B.M. to secure detention pending disposition of her case. However, fear that B.M. will "continue to run and eventually disappear and not return home" with all of its potential consequences is insufficient to justify the order entered in this case. See K.E., 963 So.2d at 867 (holding that "fear[] that child would run away and then perhaps take drugs or engage in sexual activity [was] not sufficient to justify an order holding a child with two misdemeanor offenses and a score of only two points in a secure detention facility"). This is consistent with the express legislative policy of strictly controlling the detention of juveniles in this state. If a trial judge were to treat the power to detain a child as a purely discretionary power, the purpose of the statute would be subverted. It is not for us to question the wisdom of that legislation. Rather, it is our role simply to carry it out.
As we stated at the outset, we address the issue raised in this case because of its frequent continued recurrence before this Court. The public defender has pointed out that the trial judge in this casethe same one who detained A.K. in A.K., 951 So.2d at 989has similarly detained at least three other juveniles. See id.; K.J. v. Dobuler, 939 So.2d 1073 (Fla. 3d DCA 2006); R.B. v. Dobuler, Case No. 3D07-211 (Fla. 3d DCA Jan. 26, 2007) (Wells, Cortiñas, JJ., and Schwartz, Senior J.) (order); see also A.R. v. Dobuler, 960 So.2d 793 (Fla. 3d DCA 2007). Although this might have been done for the best of motives, a decision to detain a child must be made according to the strict statutory criteria established by the legislature for this purpose. If this basic principle of the law pertaining to the detention of juveniles prior to an adjudicatory hearing or disposition was not clear before today, then we believe it should be now. Accordingly, just as the trial judge in this case had the "right to expect that [B.M. would] respect his orders" and understandably was frustrated when B.M. did not, "we, as the court created by the constitution for the purpose of supervising the lower court, are entitled to the same obedience." State ex rel. Schwartz v. Lantz, 440 So.2d 446, 450 (Fla. 3d DCA 1983).
Petition granted.
NOTES
[1] In 1994, when R.W. issued, the statutory language supporting this conclusion of the Florida Supreme Court appeared in sections 39.042(1) and (3) of the Florida Statutes (1993). Compare § 39.042, Fla. Stat. (1993) with § 985.24(1), Fla. Stat. (2007); § 985.245(1), Fla. Stat. (2007).
[2] A Risk Assessment Instrument (RAI) is a standardized document developed cooperatively by interested state agencies and utilized statewide in determinations regarding placement of a child in detention care. § 985.245(1), (2)(a). Since 1988, Florida law has required detention determinations to be based upon a validly prepared and scored RAI, replacing a scheme which had previously reposed broad discretion in juvenile court judges to make such determinations. See § 39.082(2), Fla. Stat. (1987); J.J. v. Fryer, 765 So.2d 260, 265 (Fla. 4th DCA 2000) ("The current statutory framework supplants discretion with specific rules governing the judge and disposition . . . [with the] purpose to make the matter of juvenile detention in delinquency cases less subject to individualized variations by judges."). According to criteria set by the instrument, a child who has a score of twelve or more points qualifies for secure detention, a child who has a score of seven to eleven points qualifies for home detention, and a child who scores below seven points does not qualify for any form of detention. See S.W. v. Woolsey, 673 So.2d 152, 154 (Fla. 1st DCA 1996) (detailing the requirements for a valid RAI, the instrument's method of assessing risk, and the impact of that assessment on custody status). The infraction which brought B.M. into the system is a misdemeanor. Counsel for B.M. argues, for reasons not material here, that under proper application of the uniform protocol, there should have been no point assessment for the misdemeanor on her RAI.
[3] Notably, a finding of contempt under section 985.037 would not have accomplished the trial judge's goal since B.M. could not have been placed in secure detention more than five days. § 985.037(2), Fla. Stat. (2007).
[4] We acknowledge that the final sentence of subsection 1.a, read in isolation, affords an argument equating a "run away" to an "absconder." We believe that such a wooden interpretation of this handbook provision would be improper on numerous levels ranging from unnecessarily constricting the judgment which must be afforded probation officers and other departmental personnel in making risk assessments, to vitiating the remainder of the definition requiring "intent" to avoid the legal process and excluding "simple absence[s]" from the absconder definition. Cf. Knowles v. Beverly Enters.-Fla., Inc., 898 So.2d 1, 9 (Fla.2004) ("[W]here possible, it is the duty of the courts to adopt that construction of a statutory provision which harmonizes and reconciles it with other provisions of the same act.") (quoting Agency for Health Care Admin. v. Estate of Johnson, 743 So.2d 83, 87 (Fla. 3d DCA 1999)); Triple E Dev. Co. v. Floridagold Citrus Corp., 51 So.2d 435, 438-39 (Fla.1951) ("[I]f clauses in a contract appear to be repugnant to each other, they must be given such an interpretation and construction as will reconcile them if possible[.]").
[5] The court referenced part V, sections 985.501(1)(a) and 985.502, Florida Statutes (2005). The Interstate Compact on Juveniles now appears in part XIII, sections 985.801 and 985.802, Florida Statutes (2007).
[6] A search of cases from neighboring jurisdictions reveals our understanding of the meaning of "abscond" to be similar to that of other states. See, e.g., State v. Graham, 284 N.J.Super. 413, 665 A.2d 769, 770 (1995) (noting that the offense of absconding from parole in New Jersey consists of two elements, "hiding" or "leaving" and the "intent" to avoid law enforcement); In re R., 73 Misc.2d 390, 341 N.Y.S.2d 998, 1001 (1973) ("To abscond in the eyes of the law . . . involves a design to withdraw clandestinely, to hide or conceal one's self for some purpose such as avoiding legal proceedings."); State v. Snelgrove, 299 S.C. 290, 384 S.E.2d 705, 706 (1989) (noting that "[t]here must be some evidence, either direct or circumstantial, that the departure was secretive, clandestine, or surreptitious in order for it to constitute `absconding'") (quoting State v. Wagenius, 99 Idaho 273, 581 P.2d 319, 327 (1978)).
[7] The applicable statute at the time, section 985.215(2)(a), Florida Statutes (1997) read:

(2) Subject to the provisions of subsection (1), a child taken into custody and placed into nonsecure or home detention care or detained in secure detention care prior to a detention hearing may continue to be detained by the court if:
(a) The child is alleged to be an escapee or an absconder from a commitment program, a community control program, furlough, or aftercare supervision, or is alleged to have escaped while being lawfully transported to or from such program or supervision.
§ 985.215(2)(a), Fla. Stat. (1997) (emphasis added).